[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 20-14351

Non-Argument Calendar

————————————

TYNISHA KEY,

Plaintiff-Appellant,

*versus*

CENTRAL GEORGIA KIDNEY
SPECIALISTS PC,

Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:19-cv-00253-TES

————————————

Before BRANCH, ANDERSON, and EDMONDSON, Circuit Judges.


PER CURIAM:


Tynisha Key ("Plaintiff") appeals the district court's grant of summary judgment in favor of her former employer, Central Georgia Kidney Specialists PC (the "Practice"). In this civil action, Plaintiff asserted against the Practice a claim for pregnancy discrimination: a violation of Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. §§ 2000e(k), 2000e-2. No reversible error has been shown; we affirm.


I.     Background


Plaintiff began working as a receptionist for the Practice in January 2016. In early 2017, Plaintiff transitioned to a full-time position as a Medical Assistant. Plaintiff later requested to work part-time so she could attend a nursing program; Plaintiff's part-time status took effect in May 2018. As a part-time employee working fewer than 24 hours per week, Plaintiff was ineligible for employee benefits and accrued no paid time off.

In December 2017, the Practice amended its employee handbook to include a "point system" for unexcused absences from

work. Under the point system, an employee would receive a certain number of points each time she was tardy, absent, or told the Practice on short notice that she was not coming to work. The employee handbook established a progressive discipline system for employee absences, starting with a verbal warning when an employee accrued 10 points, a written warning at 15 points, a 3-day suspension at 18 points, and termination of employment at 20 points.

Between January and October 2018, Plaintiff accumulated 14 poor-attendance points. In early November 2018, the Practice reset all employees' points (including Plaintiff's) to zero. By the end of December 2018, Plaintiff had accrued 11 points. Plaintiff then reached 20 points by mid-January 2019. By the time Plaintiff's employment was terminated in March 2019, Plaintiff had 36 points. The Practice, however, never issued Plaintiff a formal verbal or written warning or imposed other discipline as authorized under its attendance policy.

Plaintiff learned she was pregnant in September 2018. The Practice's Clinical Manager and Plaintiff's immediate supervisor (Debra Haywood) found out about Plaintiff's pregnancy in mid-January 2019. The Practice Administrator (Jennifer Carr) became aware of Plaintiff's pregnancy in early February.

On 4 March 2019, Carr called a meeting with Plaintiff and with Haywood. Among other things, Carr and Haywood asked about Plaintiff's future work plans and explained that the Practice

could not guarantee Plaintiff's job would be available when Plaintiff returned from taking time off to have her baby.[1]

At the 4 March meeting, Carr and Haywood also discussed with Plaintiff the possibility of cutting Plaintiff's Thursday afternoon shift because no doctor was scheduled to see patients during that time.  To make up for the lost hours, Carr and Haywood offered Plaintiff a shift on Monday morning.  Plaintiff declined the Monday shift because it conflicted with Plaintiff's personal schedule.

On 8 March, Plaintiff submitted a written request to take unpaid leave between 13 May and 5 August 2019 to have her baby.

On 13 March 2019 (a Wednesday), Plaintiff received written notice of a revised work schedule.  The new schedule eliminated officially Plaintiff's Thursday afternoon shift.  Plaintiff refused to sign the document.

The next day (Thursday, 14 March), Plaintiff reported to work despite having been told she was not scheduled to work that day.  When Carr learned that Plaintiff was at the office, Carr ordered Plaintiff to leave.  Plaintiff asked to speak with one of the doctors.  Plaintiff says she believed the doctors had authority over Carr and, thus, the ability to overrule Carr's scheduling decision.

---

[1] At all times pertinent to this appeal, the Practice employed fewer than 50 employees and, thus, fell outside the scope of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").  Nor did the Practice have an internal maternity leave policy.

20-14351                Opinion of the Court                5

Carr said "no." Carr then instructed Plaintiff to turn in her office key. Plaintiff did so and left the office.

The following morning -- less than two hours before Plaintiff was scheduled to work -- Plaintiff sent Carr and Haywood a text message notifying them that Plaintiff was not coming to work that day. Carr spoke to Plaintiff on the phone later that day. Carr told Plaintiff that, if Plaintiff failed to report to work on Monday, Carr would treat the absence as a resignation of Plaintiff's employment.[2]

Plaintiff reported to work as scheduled on Monday. Plaintiff's employment was then terminated the next day, on 19 March 2019. The Practice reassigned Plaintiff's duties to other employees and hired no new staff to replace Plaintiff.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which later issued Plaintiff a notice of right to sue. Plaintiff then filed this civil action. Plaintiff asserted that the Practice discriminated against her based on her pregnancy, in violation of Title VII and the PDA.

The district court granted the Practice's motion for summary judgment. The district court first determined that Plaintiff failed to establish a *prima facie* case of unlawful pregnancy discrimination under the burden-shifting framework set out in *McDonnell*

---

[2] Under the Practice's attendance policy, two consecutive unexcused absences are considered a voluntary resignation.

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3]  The district court also determined that Plaintiff failed to produce evidence sufficient to demonstrate unlawful pregnancy discrimination under a "convincing mosaic" theory.

II.    Discussion

A.

We review *de novo* the district court's grant of summary judgment; we "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). Summary judgment is appropriate when the record shows no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The district court cited to and applied correctly the pertinent summary judgment standard.  We reject Plaintiff's contention that the district court impermissibly drew inferences in favor of the Practice.  The standard for creating a genuine dispute of material fact requires courts to "make all *reasonable* inferences" -- not all

---

[3] On appeal, Plaintiff raises no challenge to the district court's ruling that Plaintiff failed to show unlawful discrimination under the *McDonnell Douglas* framework.  That issue is, thus, not before us on appeal.

20-14351              Opinion of the Court                    7

*possible* inferences -- in favor of the non-moving party.  *See Chapman*, 229 F.3d at 2023 (emphasis added).


                              B.


        Title VII makes it unlawful for a private employer to discriminate against an employee based on the employee's sex.  *See* 42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act amended Title VII to provide that discrimination "because of sex" or "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  *See* 42 U.S.C. § 2000e(k).

        To survive a motion for summary judgment, a plaintiff asserting a claim for unlawful discrimination in violation of Title VII "must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).  A plaintiff may satisfy her burden in three ways: (1) by presenting direct evidence of discriminatory intent; (2) by satisfying the *McDonnell Douglas* burden-shifting framework; and (3) by presenting "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination."  *Id.* at 1220, n.6.; *see Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (addressing the "convincing mosaic" standard).  Given the

8                    Opinion of the Court                    20-14351

case's history, we need address only whether Plaintiff has shown unlawful discrimination under the "convincing mosaic" standard.[4]

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations omitted). To establish pretext, "a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) (in the context of finding pretext under *McDonnell Douglas*). In other words, a plaintiff must produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given

_____

[4] On appeal, Plaintiff argues that this Court -- instead of using the "convincing mosaic" standard -- should analyze Plaintiff's discrimination claim under the "evidence as a whole" standard described in the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Plaintiff, however, relied expressly on the "convincing mosaic" standard before the district court. Because Plaintiff now argues for the first time that a different standard should apply, that argument is not properly before us. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.").

by the employer were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024.

The Practice says it terminated Plaintiff's employment based on a lack of work for Plaintiff, Plaintiff's habitual attendance issues, and Plaintiff's rude and disrespectful conduct toward Carr: matters that could justify a termination.

Plaintiff contends that the Practice's proffered reasons for firing her are a pretext for unlawful pregnancy discrimination as evidenced by (1) the suspicious timing of the termination of Plaintiff's employment and (2) the Practice's shifting reasons for firing Plaintiff.

1. Suspicious Timing

About timing, Plaintiff says the Practice knew about the purported lack of work and about Plaintiff's poor attendance record for months but did nothing to address these concerns until *after* Plaintiff requested time off to have her baby. Plaintiff says the timing of her firing -- months after the supposed justifications arose and only days after she sought time off -- supports an inference that the Practice terminated her employment based on Plaintiff's pregnancy and not because of the Practice's asserted justifications.

When viewed in the light of the record as a whole -- including Plaintiff's unprofessional conduct on the days immediately preceding Plaintiff's firing -- Plaintiff's evidence of "suspicious" timing

is insufficient to allow a jury to infer reasonably that the Practice's asserted reasons are a pretext for unlawful discrimination.

On 13 March, Plaintiff was given official notice that the Practice was eliminating Plaintiff's Thursday afternoon shift: a schedule change already discussed with Plaintiff on 4 March *before* Plaintiff asked for time off.  Plaintiff, however, refused to sign the document acknowledging the new schedule.  Plaintiff then reported for her Thursday shift the next day in direct disregard of the new schedule.  Carr ordered Plaintiff to leave the premises.  Plaintiff did not then leave.  Plaintiff asked to speak with one of the doctors -- a person whom Plaintiff believed could overrule Carr's scheduling decision.  Plaintiff's next interaction with Carr came the next morning when Plaintiff notified Carr less than two hours before Plaintiff's scheduled shift that Plaintiff was not coming to work.

In the light of this evidence of Plaintiff's acts of defiance and insubordination on March 13 and 14, followed immediately by another instance of Plaintiff's excessive absenteeism on 15 March, Plaintiff has failed to satisfy her burden of showing that the Practice's stated reasons simply were not the real reasons for firing Plaintiff.  That Carr ordered Plaintiff to turn in her office key before leaving on 14 March further supports that Plaintiff's conduct that day was an important motivating factor in the ultimate decision to terminate Plaintiff's employment.

Plaintiff seeks to equate her rude and insubordinate behavior on March 13 and 14 to an earlier time when Plaintiff was rude to Carr in February 2019.  According to Plaintiff, that she was not

disciplined for her rude behavior in February 2019 (before requesting time off) and then fired for rude behavior in March 2019 (after requesting time off) is evidence of pretext.

During the February 2019 incident, Plaintiff called Carr about a discrepancy in Plaintiff's paycheck. Carr explained to Plaintiff that the Practice had deducted an amount from Plaintiff's paycheck to correct an earlier overpayment. Plaintiff testified that Plaintiff was upset on the phone, but that Carr calmed Plaintiff down and helped Plaintiff understand what had happened. Plaintiff then apologized to Carr the next day for Plaintiff's conduct during the phone conversation.

During the March 2019 encounter -- unlike the February 2019 phone call -- Plaintiff refused to accept Carr's explanation for the complained-of managerial decision, acted in direct defiance of Carr's instructions, and challenged Carr's authority. And instead of offering Carr an apology the next day, Plaintiff notified Carr less than two hours in advance of Plaintiff's scheduled shift that Plaintiff would not report to work that day. Given the material differences between the February 2019 phone call and the March 2019 incident, that Plaintiff experienced differing consequences in response to her episodes of rudeness is no evidence from which a jury could infer pretext. Instead, the record demonstrates that the severity of the discipline following the March 2019 incident -- the second successive incident of confrontation and rudeness -- corresponded to the degree of Plaintiff's unprofessional conduct during that encounter, not to Plaintiff's request for time off.

2.  Shifting Reasons

Plaintiff also contends that the Practice's failure to articulate clearly and consistently the reasons for terminating her employment demonstrate that the Practice's stated reasons are a pretext for discrimination.  In support of this argument, Plaintiff relies on our decisions in *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286 (11th Cir. 2006), and in *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261 (11th Cir. 2017).

Plaintiff says when she was fired on 19 March, Carr and Dr. Akbar told her that her position was being eliminated because there was insufficient work.  On the Separation Notice form filed with the State of Georgia Department of Labor, the Practice marked a box indicating that the reason for Plaintiff's separation was "lack of work."

During this lawsuit, however, the Practice asserted more reasons for terminating Plaintiff's employment, including Plaintiff's absenteeism and rude behavior.  Plaintiff calls the supplementation a "change."  Plaintiff says the Practice's changing reasons support an inference that the decision to fire Plaintiff was not motivated by the proffered reasons.

We have said that "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."  *See Hurlbert*, 439 F.3d at 1298 (in the

context of establishing pretext under the *McDonnell Douglas* framework). In both *Hurlbert* and in *Jones*, we concluded that inconsistencies in the employer's stated reasons for terminating the plaintiffs' employment -- when viewed together with other evidence of pretext -- was sufficient to avoid summary judgment. *See id.* at 1298-99 (concluding that inconsistencies in the employer's asserted reasons for terminating plaintiff's employment -- considered together with (1) the temporal proximity between the plaintiff's request for FMLA leave and his termination and (2) the employer's deviation from its standard procedures -- constituted sufficient evidence of pretext to avoid summary judgment); *Jones*, 854 F.3d at 1275-76 (inconsistencies in the employer's proffered reasons for terminating plaintiff -- considered in conjunction with a supervisor's comment about the inconvenience of plaintiff's FMLA leave and the temporal proximity between plaintiff's return from FMLA leave and his termination -- created a genuine dispute of material fact about whether the employer's stated reasons were pretextual).

Unlike the plaintiffs in *Hurlbert* and in *Jones*, Plaintiff has failed to produce evidence that -- when considered together with the purported inconsistencies in the Practice's stated reasons -- is sufficient to support a reasonable inference of pretext. Plaintiff has failed to show adequately "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Practice's justifications such that a reasonable factfinder could find them unworthy of credence. *See Gogel*, 967 F.3d at 1136.

Viewing the record in the light most favorable to Plaintiff, Plaintiff has demonstrated no "convincing mosaic of circumstantial evidence" that would support a reasonable inference that the Practice's decision to terminate her employment was motivated by unlawful pregnancy discrimination.  We affirm the district court's grant of summary judgment in favor of the Practice.

AFFIRMED.